## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

|  |  |
|---|---|
| **DIRECT COMPONENTS, INC.,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**MICROCHIP USA, LLC, TREVOR TOMA, JEFF RUBY, JOSH ARNOLD, JACK LAWLESS, ALEX HART, MITCHELL KOGGE, TYLER AYALA, PAUL VENZOR, DREW VAN DE MOTTER, KIMIE KOGA, JOSEPH CENTRONE, JOHN BROWN, AND MICHAEL PRUSIK,**<br><br>    **Defendants.** | **CASE NO. TBD** |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Direct Components, Inc. ("DCI") files its Complaint for injunctive and other relief against MICROCHIP USA, LLC and a number of DCI's former employees and contractors, TREVOR TOMA, JEFF RUBY, JOSH ARNOLD, JACK LAWLESS, ALEX HART, MITCHELL KOGGE, TYLER AYALA, PAUL VENZOR, DREW VAN DE MOTTER, KIMIE KOGA, JOHN BROWN, JOSEPH CENTRONE, and MICHAEL PRUSIK (collectively the "Individual Defendants"), (collectively all referred to as the "Defendants").

The Complaint includes claims for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 ("DTSA"). U.S.C. § 1836, *et seq.*, misappropriation of trade secrets under the Florida Uniform Trade Secrets Act ("FUTSA"), § 668.001, FLA. STAT. *et seq.*; breach of contract for violations of valid

and enforceable restrictive covenant agreements; tortious interference with contractual and business relationships; breach of duty of loyalty; aiding and abetting the breach of duty of loyalty; and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

DCI alleges as follows:

## JURISDICTION AND VENUE

1. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. This Court has subject matter jurisdiction over the parties and this action pursuant to 28 U.S.C. § 1331 because it raises federal questions, specifically claims under the federal DTSA, 18. U.S.C. § 1836.

3. The Court has supplemental jurisdiction over the various state law claims set forth herein, pursuant to 28 U.S.C. § 1367, because they are so related to the federal claims that they form part of the same case or controversy.

4. The Court has personal jurisdiction over MICROCHIP USA because its members are, upon information and belief, entities that would be considered citizens of the State of Florida, was formed in Florida, is registered to do business in Florida, it engages in substantial, continuous, and systematic, business in Florida, its employees are principally located in and work in Florida, and its actions—including the tortious acts aimed at DCI—caused injury to DCI in Florida.

5.      Venue is proper pursuant to 28 USC § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

6.      Venue is also proper before this Court because at least one Defendant is subject to this Court's personal jurisdiction with respect to this action.

## PARTIES

7.      DCI is a Florida Corporation with its principal place of business in Tampa, Florida.

8.      Defendant MICROCHIP USA, LLC is a Florida Limited Liability Company with its principal place of business at 4511 N. Himes Avenue, Suite 100, Tampa, FL 33614, and it can be served through its registered agent for service, Trevor Toma, at 4511 N. Himes Avenue, Suite 100, Tampa, FL 33614.

9.      Upon information and belief, Defendant TREVOR TOMA is an individual residing at 3206 W. Azeele Street, Apt. 129, Tampa, FL 33609. TOMA is a former employee of DCI and now an indirect owner of MICROCHIP USA.

10.     Upon information and belief, Defendant JEFF RUBY is an individual residing at 317 Hickory Acres Lane, St. Johns, Florida 33259. RUBY is a former contractor of DCI and now, upon information and belief, is employed by or contracts with MICROCHIP USA.

11.     Upon information and belief, Defendant JOSH ARNOLD is an individual residing at 401 Harbor Place Drive, Apt 1208, Tampa, FL 33602.

ARNOLD is a former employee of DCI and now an indirect owner of MICROCHIP USA.

12.   Upon information and belief, Defendant JACK LAWLESS is an individual residing at 2524 W. Frierson Ave, Apt 4, Tampa, FL 33614. LAWLESS is a former employee of DCI and now an indirect owner of MICROCHIP USA.

13.   Upon information and belief, Defendant ALEX HART is an individual residing at 5724 Harding Blvd. NE, Saint Petersburg, FL 33703. HART is a former employee of DCI and now an indirect owner of MICROCHIP USA.

14.   Upon information and belief, Defendant MITCHELL KOGGE is an individual residing at 11007 Summer Drive, Tampa, FL 33624. KOGGE is a former employee of DCI and now an indirect owner of MICROCHIP USA.

15.   Upon information and belief, Defendant TYLER AYALA is an individual residing at 2134 Victory Ave, Largo, FL 33770. AYALA is a former employee of DCI and now an indirect owner of MICROCHIP USA.

16.   Upon information and belief, Defendant PAUL VENZOR is an individual residing at 1834 Elaine Drive, Clearwater, FL 33760. VENZOR is a former employee of DCI and now an indirect owner of MICROCHIP USA.

17.   Upon information and belief, Defendant DREW VAN DE MOTTER is an individual residing at 808 N Franklin St, Unit 2508, Tampa, FL 33602. VAN DE MOTTER is a former employee of DCI and now an indirect owner of MICROCHIP USA.

18.    Upon information and belief, Defendant KIMIE KOGA is an individual residing at 6596 19th St N, Saint Petersburg, FL 33702. KOGA is a former employee of DCI and now an employee of MICROCHIP USA.

19.    Upon information and belief, Defendant JOHN BROWN is an individual residing at 5006 West McCoy Street, Unit A, Tampa, FL 33611. BROWN is a former employee of DCI and, upon information and belief, now is employed by MICROCHIP USA.

20.    Upon information and belief, Defendant JOSEPH CENTRONE is an individual residing at 13707 Wilkes Drive, Tampa, FL 33618. CENTRONE is a former employee of DCI and, upon information and belief, now contracts with MICROCHIP USA.

21.    Upon information and belief, Defendant MICHAEL PRUSIK is an individual residing at 2524 W. Frierson Ave, Apt 4, Tampa, FL 33614. PRUSIK is a former employee of DCI and, upon information and belief, now is employed by MICROCHIP USA.

### DCI'S BUSINESS
### AND LEGITIMATE BUSINESS INTERESTS

22.    Starting in 1998, DCI has purchased and sold and continues to purchase and sell electronics components such as microchips, integrated circuits, and semiconductors from numerous vendors to various national and international customers—including original equipment manufacturers—who require these specialized components for their own respective products.

23.     The national and international market within which DCI operates have substantial risks, particularly including the risks of purchasing counterfeits, used parts sold as "new," and other non-conforming products.

24.     These electronic components are in high demand and in short supply, leading to this industry being highly competitive.

25.     DCI's business relies heavily on its technical experience, business acumen, along with the relationships it forms with its customers and vendors.

26.     As such, DCI's customers pay a premium for these highly sought after and often critical components. Its customers have to trust that DCI will supply a high-quality product.

27.     Relationships with reliable wholesale microchip vendors—i.e., ones that it knows can provide quality conforming components at reasonable prices— are very time-consuming to develop since such vendors only conduct business with a few select parties like DCI.

28.     DCI distinguishes itself in numerous ways within the industry. For instance, DCI has obtained certifications from internationally recognized industry groups related to its operations, including—but not limited to—ISO 9001, AS9120, and AC0056B certifications.

29.     These certifications are highly sought after by customers because they demonstrate reliable indications that the products obtained from a wholesale distributor like DCI are less prone to include counterfeits, used parts sold as "new," and other non-conforming products.

30.     Similarly, DCI has created its own in-house testing laboratory to try to verify as much as reasonable practical that the specialized products it acquires from vendors are, in fact, quality, conforming components and not counterfeits, used parts sold as "new," and other non-conforming products.

31.     Further still, DCI uses a customer relations management software platform—the ZoHo™ platform—that it has significantly customized to streamline its business operations, including—but not limited to—various aspects of workflows, processes, campaigns, pricing, purchasing, acquisition, transportation and storage tracking, operation measurement, and delivery of products to customers.

32.     On information and belief, the ZoHo™ platform is a relatively new customer relations management software platform that relatively few companies utilize in the manner that DCI does, and there are few national or international companies that create custom code for the ZoHo™ platform.

33.     Over the years, DCI has made thousands of lines of custom code modifications to its version of the ZoHo™ platform, representing a significant expenditure of time, money, and effort to specialize this platform for its own use.

34.     DCI's employees—particularly those within its information technology departments—participated in the creation of the custom code modifications.

35.     Further still, DCI's employees gained substantial knowledge and had access to DCI's version of the ZoHo™ platform, including extensive knowledge of how DCI's version operates.

36.     DCI has also invested heavily in establishing substantial relationships with its customers and vendors, and DCI develops and maintains those relationships to build a successful operation, to enable DCI to maintain its competitive edge and excel in the industry.

37.     For companies like DCI, its main assets are this technical know-how; confidential and/or proprietary information and/or trade secrets; specialized and customized software customer relations management tools; and information about and relationships with its current and prospective customers and vendors.

38.     DCI's confidential and/or proprietary information and/or trade secrets includes—among other things—(a) information identifying or tending to identify any of DCI's existing or prospective customers and vendors; (b) DCI's intellectual property, methods, call or sales scripts, workflows, processes, procedures, concepts, inventions, recordings, advertising and promotional materials, computer programs, software, or code—whether or not protected under any law; (c) DCI's business and marketing plans, methods, services, procedures, and techniques; (d) DCI's financial information, pending and completed sales information, product pricing, pricing sliders, market analyses, product costing, customer or vendor purchase or order histories, product quotes, and financial

forecasts and projections of DCI, and (e) any of the various electronic or operational systems that DCI utilizes.

39.     DCI's assets are the product of years of accumulated and distilled information and which is very valuable and maintained with secrecy.

40.     All of this information derives independent economic value from not being generally known to the public and not being readily ascertainable by proper means and has been subject to efforts that are reasonable under the circumstances to maintain their secrecy.

41.     DCI communicates its confidential and/or proprietary information along with its trade secret information to its employees in confidence with the expectation that the employees will only use it in connection with respective employment with DCI.

42.     Over the years, DCI made significant efforts to protect its legitimate business interests—including, but not limited to, entering into restrictive covenant agreements that include confidentiality, non-disclosure, non-competition, and/or non-solicitation provisions with certain employees. These measures are common and reasonable within the industry.

43.     In addition to the above, DCI employees have been provided with Employee Handbooks, which have been updated from-time-to-time. The Employee Handbook includes policies addressing the use and disclosure of DCI's confidential information and trade secrets (such as information about client or vendors, business plans, tools, products, and strategy methods), unauthorized use of computers, theft of

DCI's property, the appropriate business use of the internet and email system, and the safeguarding of customer and potential customer personal information.

44.     Moreover, DCI has taken steps to protect its confidential and/or proprietary information, requiring that its employees use electronic credentials and passwords before they can connect to its systems like its customer relationship management system to access consumer data.

45.     The confidential information described above include DCI's trade secrets, which if the trade secrets were to become known to competitors, DCI would lose the competitive advantage afforded it by this information. Over the years, DCI expended substantial time, effort, money, and resources in developing and maintaining its trade secrets.

## RELEVANT CONTRACTUAL AGREEMENTS

46.     As a condition of their respective employment, promotions and continued employment, and other good and valuable consideration, TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, and PRUSIK, each signed a substantially similar *Mutual Non-Disclosure & Confidentiality Agreements* (the "Confidentiality Agreements") with DCI—a true and correct copy of each Confidentiality Agreement is attached as **Composite Exhibit A**.

47.     These Confidentiality Agreements each specifically provide, in relevant part:

It is understood and agreed to that the "Discloser" and the "Recipient" would like to exchange certain information that may be considered confidential. To ensure the protection of such information and in consideration of the agreement to exchange said information, the parties agree as follows:

1.      The confidential information to be disclosed by Discloser under this Agreement ("Confidential Information") can be described as and includes:

> Any and all know-how, trade secrets, product designs and specifications, formulas, configurations, test results and manufacturing rights, business and product plans and strategies, costing data, pricing policies, accounting and financial data and results, financial projections, supplier and customer lists, employee information, contract terms, and business documents and forms. Proprietary Information may be in any form, including without limitation, documents, proprietary forms, software and other electronic data, discussions or written correspondence, regardless of whether such information is designated as "Confidential Information" at the time of its disclosure.

* * *

2.      Recipient shall limit disclosure of Confidential Information within its own organization to its directors, officers, partners, members and/or employees having a need to know and shall not disclose Confidential Information to any third party (whether an individual, corporation, or other entity) without the prior written consent of Discloser.

* * *

9.      This Agreement shall run for a period of five (5) years from the Effective Date of this Agreement, whether any other agreement to perform work or services is entered between the Parties. Either Party may terminate this Agreement by thirty-(30) days' prior notice, in writing, to the other Party. Termination of this Agreement, however, shall not release either Party from its obligations. Upon termination of this Agreement, Recipient shall, upon the request of Discloser and at Discloser's option, return to Discloser all originals, copies, reproductions and summaries of Proprietary Information and all other tangible

materials provided to Recipient as Proprietary Information or furnish a certificate of destruction thereof.

(*See* **Composite Exhibit A**.)

48.     As a condition of his employment and other good and valuable consideration, BROWN signed an agreement regarding protecting the confidentiality of  DCI's financial data, proprietary information, policy information, company documents and business information and prohibiting him from disclosing such information after his separation—a true and correct copy of this Confidentiality Policy is attached as **Exhibit B**.

49.     As a condition of their respective employment and/or promotions and continued employment, and other good and valuable consideration, several of the Individual Defendants—including specifically PRUSIK and CENTRONE— signed a substantially similar *Confidentiality, Nonsolicitation, and Non-Competition Agreements* (the "Restrictive Covenants") with DCI. A true and correct copy of the Restrictive Covenants that PRUSIK and CENTRONE executed are attached as **Composite Exhibit C**.

50.     The Restrictive Covenants each specifically provide, in relevant part:

> **2.     Restrictive Covenants.** The Company and Employee agree to the following representations and restrictive covenants:

> * * *

> (b)     Restrictive Covenants. Employee shall not do any of the following, directly or indirectly, in any capacity, either for Employee or on behalf of any other person:

(1)     After termination of his or her employment for any reason whatsoever. Employee shall not retain or remove, without the Company's advance written consent, any list, data, book, record, design, manual, drawing, formula, document, schedule, source code, specification, computer program or software, password, or other written or electronic information pertaining to the business and financial affairs of the Company;

(2)     At any time during his or her employment by the Company and following termination for any reason, except to the extent expressly authorized by the Company or in the course of performing his or her services for the Company, Employee shall not reveal, divulge, or disclose, for any reason or in any manner, to any person who is not an officer, director, employee, or shareholder of the Company any information (written or unwritten) concerning trade secrets, proprietary data, or other confidential information relating to the business or financial affairs of the Company (collectively, "**Protected Information**"), including, without limitation, the following: (a) information identifying or tending to identify any of the existing or prospective clients, customers, suppliers, vendors, employees, and independent contractors of the Company; (b) information regarding any intellectual property of the Company, including all patents, trademarks, trade names, service marks, licenses, and copyrighted materials, and all copy, ideas, designs, methods, scripts, processes, procedures, concepts, inventions, recordings, advertising and promotional materials, and computer programs, software, and source codes, whether or not protected under any law; and (c) information pertaining to the plans, methods, services, suppliers, processes, prospects, procedures, techniques, financial statements, pricing, costing, and financial forecasts and projections of the Company, but excluding any disclosure required by law, by a court of competent jurisdiction, or to respond in good faith to a valid inquiry by a governmental authority and excluding any information that Employee conclusively demonstrates either is generally publicly available with respect to the business of the Company or that was known to Employee before he became affiliated with the Company; and

(3)     Employee shall use all Protected Information solely for the purpose of providing services to the Company. Additionally, Employee shall not duplicate or reproduce any Protected Information except as necessary to render and furnish services to the Company. Upon Company request or upon termination of employment, Employee shall promptly (and in any event within three (3) days) return

13

to the Company all Protected Information, all other Company documents and information, and all copies and any analyses, synopses, summaries, and reproductions of Protected Information or Company documents and information. Employee shall not place any Protected Information on his personal or other computer, cell phone, tablet, or any other storage devices without permission from the Company.

\* \* \*

(6)     During the period that Employee is employed by the Company, and for a period of two years after termination of the employment for any reason, Employee shall not, directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of, or be connected as an officer, employee, partner, director, agent, or otherwise with, or have any financial interest in, or aid or assist anyone else in the conduct of, any business of the type conducted by the Company or that competes with the Company in the United States or Canada; provided, however, that the foregoing agreement shall not preclude the ownership of not more than 1% of the equity securities of a corporation which has such securities registered under Section 12 of the Securities Exchange Act of 1934, as amended. Employee further agrees that during his employment with the Company, he shall not make any preparations to engage in any activity which would be prohibited by the foregoing provisions of this Section.

\* \* \*

(*See* **Composite Exhibit C**.)

51.     DCI's legitimate business interests supporting the above agreements include, but are not limited to, the confidential and/or proprietary information and/or trade secrets it shares with the subject employees; its market share within the industry; its relationships with identifiable customers, prospective customers, vendors, prospective vendors, and employees; and DCI's reputation and goodwill in the industry.

14

## MICROCHIP USA'S CREATION AND OPERATIONS

52.     MICROCHIP USA was created at the end of October 2021.

53.     MICROCHIP USA was founded by former employees of DCI, including TOMA, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VAN DE MOTTER, and VENZOR, and who left *en masse* with other employees and contractors of DCI, including RUBY and KOGA, on or about October 21, 2021.

54.     Upon information and belief, MICROCHIP USA quickly began to operate starting in November 2021.

55.     Upon information and belief, and just like DCI, MICROCHIP USA sells electronics components, primarily microchips, integrated circuits, and semiconductors, and its customers include manufacturers that require these specialized components for their products, which makes it a direct competitor of DCI.

56.     Upon information and belief, one or more owners and managers of MICROCHIP USA—including, but not limited to, TOMA and LAWLESS—misappropriated from DCI its confidential and/or proprietary information, including on information and belief the following:

> (a)     One or more databases containing DCI's customer and/or vendor lists and related information;
>
> (b)     Spreadsheets containing pending orders and completed sales information;
>
> (c)     DCI employee sales data;
>
> (d)     Accounts receivable data;

(e)    Pending and closed order data;

(f)    Product pricing and market analyses;

(g)    Marketing materials;

(h)    Call scripts and other materials utilized by sales agents to interact with customers;

(i)    Various contract and template documents related to DCI's business operations, including product analysis reports; and

(j)    An international telephone account information used to place calls to customers and/or vendors, which is invoiced to DCI.

57.    Upon information and belief, MICROCHIP USA—like DCI—utilizes the ZoHo™ platform as its customer relations management tool and may be utilizing in the substantially same manner as DCI.

58.    The foregoing represent the confidential and/or proprietary information and trade secrets belonging to DCI from DCI's electronic systems.

59.    There is no legitimate business reason for these individuals or MICROCHOP USA to have taken any of the above confidential and/or proprietary information and trade secrets belonging to DCI from DCI's electronic systems.

60.    Upon information and belief, MICROCHIP USA and/or the Individual Defendants utilized directly or derivatively the confidential and/or proprietary information and trade secrets of DCI to solicit and obtain business from various customers and/or vendors that previously did business with DCI such that those entities stopped doing business with or significantly diminished their business with DCI starting in late 2021 and continuing through the present.

16

61.    Upon information and belief, MICROCHIP USA and/or the Individual Defendants individually or collectively solicited and eventually hired away or contracted with former employees and/or contractors of DCI—including, but not limited to, PRUSIK, BROWN, and CENTRONE—from late 2021 through the present.

62.    Upon information and belief, MICROCHIP USA and/or the Individual Defendants individually or collectively knew or with reasonable due diligence that similar businesses regularly expend would have known, that the individuals it solicited away from DCI had various restrictive covenant agreements with DCI.

63.    DCI continues to investigate the extent of the Defendants' actions, and it reserves the right to amend this Complaint based on new information and evidence learned during its investigation.

64.    Since DCI's relatively recent discovery of the Defendants' actions in the misappropriation of confidential and/or proprietary information and trade secrets, violations of the Confidentiality Agreements and/or Restrictive Covenants, and other tortuous or deceptive and unfair practices, DCI has had to focus its resources on mitigation and protecting DCI from the loss of its trade secrets, confidential and/or proprietary information, and the solicitation of its employees, customers, and vendors.

65.    As a further result of DCI's relatively recent discovery of the Defendants' actions, DCI has suffered, and will continue to suffer, irreparable harm along with economic damages.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS – DEFEND TRADE SECRETS ACT, 18. U.S.C. § 1836 (Against All Defendants)

66.    DCI realleges and incorporates paragraphs 7-22, 25-27, 26-60, 62-65, as if fully set forth herein.

67.    While employed with DCI, the Individual Defendants had access to DCI's confidential information, including—but not limited to—information identifying or tending to identify any of DCI's existing or prospective customers and vendors; DCI's intellectual property, methods, call or sales scripts, workflows, processes, procedures, concepts, inventions, recordings, advertising and promotional materials, computer programs, software, or code—whether or not protected under any law; DCI's business and marketing plans, methods, services, procedures, and techniques; DCI's financial information, pending and completed sales information, product pricing, pricing sliders, market analyses, product costing, customer or vendor purchase or order histories, product quotes, and financial forecasts and projections of DCI, and any of the various electronic or operational systems.

68.    DCI expended substantial time, effort, money, and resources in developing and maintaining its confidential information.

69.     DCI takes reasonable, affirmative measures to maintain the confidentiality of this information for its exclusive benefit and competitive advantage in the industry.

70.     This information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

71.     This confidential information constitutes trade secrets subject to protection under the DTSA, 18 U.S.C. §1832.

72.     DCI's trade secrets are related to a product or service used in, or intended for use in, interstate or foreign commerce.

73.     By signing their respective agreements, the Individual Defendants knew they had a duty to maintain the secrecy of and not disclose or misappropriate DCI's trade secrets for their own benefit or for the benefit of another to the detriment of DCI and return any trade secrets in their possession upon separation.

74.     The Individual Defendants had actual knowledge that the information they obtained during their association with DCI was, as described above, DCI's trade secrets.

75.     Upon information and belief, the Individual Defendants, wrongfully misappropriated and/or disclosed the trade secrets and used the confidential or proprietary information or trade secrets—without DCI's express or implied consent— to advance their own pecuniary interests and/or those of MICROCHIP USA, in

violation of the Confidentiality Agreements and/or Restrictive Covenants and Federal law.

76.     Upon information and belief, the Individual Defendants misappropriated DCI's trade secrets, or appropriated them without authorization, by taking them for purposes not authorized by their Confidentiality Agreements and/or Restrictive Covenants with DCI.

77.     Upon information and belief, the Individual Defendants also misappropriated DCI's trade secrets, or appropriated them without authorization, by taking them after the Individual Defendants' employment with DCI ended and failing to return them when their employment ended.

78.     Upon information and belief, the Individual Defendants knew, or should have known, that they were prohibited from retaining, disclosing, or using DCI's trade secrets after their employment with DCI ended.

79.     Upon information and belief, the Defendants used or conspired to use DCI's confidential information or trade secrets to solicit DCI's actual and prospective customers and vendors to purchase competitive products through MICROCHIP USA.

80.     Upon information and belief, the Defendants continue to wrongfully disclose and use DCI's confidential information or trade secrets—without DCI's express or implied consent—to advance their own pecuniary interests and/or those of MICROCHIP USA.

81.     Upon information and belief, the misappropriation was willful and malicious.

82.     Upon information and belief, the unlawful actions are continuing.

83.     Unless the Defendants are permanently restrained and enjoined from using the subject trade secrets, DCI will suffer irreparable injury, as the Defendants will continue to have access and the ability to make use of DCI's trade secrets for financial gain.

84.     As a direct and proximate result of the Defendants' misappropriation of DCI's trade secrets, DCI has suffered, and will continue to suffer, irreparable harm and economic damages, including—but not limited to—disruption of business, lost revenues and profits, incidental and consequential damage, actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.

85.     DCI has retained the Ogletree Deakins firm to represent it in this action and is entitled to recover reasonable attorneys' fees and litigation costs to the full extent allowed under the law.

WHEREFORE, DCI respectfully requests that this Court:

(a)     Enter a permanent injunction prohibiting the Defendants' use and disclosure of DCI's trade secrets;

(b)     Enter judgment in favor of DCI and against Defendants;

(c)     Award DCI damages to include actual damages, lost revenues and profits, incidental and consequential damages, any other losses attributable to the misappropriations, and unjust enrichment;

(d)     Award DCI its attorneys' fees and costs as permitted by the DTSA;

(e)     Award DCI exemplary damages as permitted by law;

(f)     Award DCI prejudgment interest; and

(g)    Grant such other and further relief as this Court deems just and proper.

## COUNT II – MISAPPROPRIATION OF TRADE SECRETS – FLORIDA UNIFORM TRADE SECRETS ACT
### (Against All Defendants)

86.    DCI re-alleges and incorporates paragraphs 7-22, 25-60, 62-65, as if set forth in full herein.

87.    As employees of DCI, the Individual Defendants had access to DCI's confidential information, including—but not limited to—information identifying or tending to identify any of DCI's existing or prospective customers and vendors; DCI's intellectual property, methods, call or sales scripts, workflows, processes, procedures, concepts, inventions, recordings, advertising and promotional materials, computer programs, software, or code—whether or not protected under any law; DCI's business and marketing plans, methods, services, procedures, and techniques; DCI's financial information, pending and completed sales information, product pricing, pricing sliders, market analyses, product costing, customer or vendor purchase or order histories, product quotes, and financial forecasts and projections of DCI, and any of the various electronic or operational systems.

88.    DCI expended substantial time, effort, money, and resources in developing and maintaining this confidential information.

89.    DCI takes reasonable, affirmative measures to maintain the confidentiality of this information for its exclusive benefit and competitive advantage in the industry.

90.     This confidential information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

91.     This confidential information qualifies as DCI's trade secrets as defined by the FUTSA.

92.     By signing their respective agreements, the Individual Defendants knew they had a duty to maintain the secrecy of and not disclose or misappropriate DCI's trade secrets for their own benefit or for the benefit of another to the detriment of DCI and return any trade secrets in their possession upon separation.

93.     Upon information and belief, the Individual Defendants wrongfully disclosed the trade secrets to MICROCHIP USA and used the confidential or proprietary information or trade secrets—without DCI's express or implied consent—to advance their own pecuniary interests and/or those of MICROCHIP USA, in violation of their Confidentiality Agreements and/or Restrictive Covenants and Florida law.

94.     Upon information and belief, the Individual Defendants misappropriated DCI's trade secrets, or appropriated them without authorization, by taking them for purposes not authorized by their respective agreements.

95.     Upon information and belief, the Individual Defendants also misappropriated DCI's trade secrets, or appropriated them without authorization, by

taking them after the Individual Defendants' employment with DCI ended and failing to return them when their employment ended.

96.     Upon information and belief, the Individual Defendants knew, or should have known, that they were prohibited from retaining, disclosing, or using DCI's trade secrets after their employment with DCI ended.

97.     Upon information and belief, the Individual Defendants used or conspired to use DCI's confidential information or trade secrets to solicit DCI's actual and prospective customers and vendors to purchase competitive products through MICROCHIP USA.

98.     Upon information and belief, the Individual Defendants continue to wrongfully disclose and use DCI's confidential information or trade secrets—without DCI's express or implied consent—to advance their own pecuniary interests and/or those of MICROCHIP USA.

99.     Upon information and belief, the misappropriations were and continue to be willful and malicious.

100.     Upon information and belief, the unlawful actions are continuing.

101.     Unless the Defendants are restrained and enjoined from using the subject trade secrets, DCI will suffer irreparable injury, as the Defendants will continue to have access and the ability to make use of DCI's trade secrets for financial gain.

102.     As a direct and proximate result of the Defendants' misappropriation of DCI's trade secrets, DCI has suffered, and will continue to suffer, irreparable harm and economic damages, including—but not limited to—disruption of business, lost

revenues and profits, incidental and consequential damage, actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss, punitive and/or exemplary damages, and attorneys' fees as a result of the misappropriation.

103.    DCI has retained the Ogletree Deakins firm to represent it in this action and is entitled to recover reasonable attorneys' fees and litigation costs to the full extent allowed under the law.

WHEREFORE, DCI respectfully requests that this Court:

    (a)    Enter a permanent injunction prohibiting the use and disclosure of DCI's trade secrets;

    (b)    Enter judgment in favor of DCI and against the Defendants;

    (c)    Award DCI damages to include actual damages and unjust enrichment;

    (d)    Award DCI its attorneys' fees and costs as permitted by the Florida Uniform Trade Secrets Act;

    (e)    Award DCI exemplary damages as permitted by law;

    (f)    Award DCI prejudgment interest; and

    (g)    Grant such other and further relief as this Court deems just and proper.

**COUNT III – BREACH OF CONTRACT –
DISCLOSURE OF CONFIDENTIAL INFORMATION
(Against Certain Individual Defendants)**

104.    DCI realleges and incorporates paragraphs 7-16, 18-22, 25-60, 62-65, as if fully set forth herein.

105.   The respective agreements of TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK with DCI are each valid and enforceable restrictive covenant agreements.

106.   The respective agreements of TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK prohibit each such defendant—during his or her employment with DCI, and following his or her separation from employment—from disclosing or using any confidential information except as required in the course of his or her employment with DCI.

107.   The respective agreements of TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK prohibit each such defendant—during his or her employment with DCI, and for at least five (5) years following his or her separation from employment—from disclosing any confidential information to any third party—whether an individual, corporation, or other entity—without the prior written consent of DCI.

108.   DCI fully performed its obligations under the respective agreements.

109.   Upon information and belief, of TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK knowingly, intentionally, and materially breached the terms of their respective agreements by, among other things, misappropriating

26

DCI's confidential information or trade secrets and using such confidential information or trade secrets to advance his or her own pecuniary interests and/or the pecuniary interests of MICROCHIP USA.

110.   Upon information and belief, the respective unlawful acts of TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK are ongoing.

111.   As a direct and proximate result of the breach of their respective contracts, DCI has suffered, and will continue to suffer, irreparable harm and economic damages.

WHEREFORE, DCI respectfully requests that this Court:

(a)   Enter a permanent injunction prohibiting TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK from violating the terms of their respective agreements as it relates to DCI's confidential and/or proprietary information;

(b)   Enter judgment in favor of DCI and against TOMA, RUBY, ARNOLD, LAWLESS, HART, KOGGE, AYALA, VENZOR, KOGA, BROWN, CENTRONE, and PRUSIK;

(c)   Award DCI actual damages, and its costs and attorneys' fees incurred in prosecuting this action;

(d)   Award DCI prejudgment interest; and

(e)   Grant such other and further relief as this Court deems just and proper.

## COUNT IV – BREACH OF CONTRACT – NON-COMPETITION
### (Against PRUSIK and CENTRONE)

112.   DCI realleges and incorporates paragraphs 7, 19, 21, 25-45, 48-60, 63-65, as if fully set forth herein.

113.   PRUSIK and CENTRONE's respective agreements with DCI are each valid and enforceable restrictive covenant agreements.

114.   PRUSIK and CENTRONE's respective agreements prohibit each— during his employment with DCI, and following his separation from employment—directly or indirectly, own, manage, operate, control or participate in the ownership, management, operation or control of, or be connected as an officer, employee, partner, director, agent, or otherwise with, or have any financial interest in. or aid or assist anyone else in the conduct of, any business of the type conducted by DCI or that competes with DCI in the United States or Canada.

115.   DCI fully performed its obligations under the respective agreements.

116.   Upon information and belief, PRUSIK and CENTRONE knowingly, intentionally, and materially breached the terms of their respective agreements by, among other things, going to work for or to perform contract work for MICROCHIP USA.

117.   Upon information and belief, the Individual Defendants' unlawful actions are ongoing.

118.    As a direct and proximate result of the Individual Defendants' breach of their contracts, DCI has suffered, and will continue to suffer, irreparable harm and economic damages.

WHEREFORE, DCI respectfully requests that this Court:

(a)    Enter a permanent injunction prohibiting the Individual Defendants from violating the terms of their respective agreements as it relates to DCI's confidential and/or proprietary information;

(b)    Enter judgment in favor of DCI and against the Individual Defendants;

(c)    Award DCI actual damages, and its costs and attorneys' fees incurred in prosecuting this action;

(d)    Award DCI prejudgment interest; and

(e)    Grant such other and further relief as this Court deems just and proper.

### COUNT V – TORTIOUS INTERFERENCE WITH PLAINTIFF'S ADVANTAGEOUS BUSINESS RELATIONSHIPS (AGAINST ALL DEFENDANTS)

119.    DCI realleges and incorporates paragraphs 7-21, 25-56, 58-65, as if fully set forth herein.

120.    DCI has valid and enforceable restrictive covenant agreements with some or all of the Individual Defendants that prohibit them, among other things, from (i) disclosing and/or using any confidential information, except as required in the course of his or her employment with DCI; and/or (ii) competing with DCI.

121.    DCI has advantageous business relationships with its employees and its current and prospective customers and vendors in its market area, which encompasses the entire nation along with foreign markets.

29

122.    DCI has spent time and money identifying, developing, and maintaining the various relationships with its employees and its customers and vendors, which were developed over an extensive period of time and at great expense.

123.    DCI has a reasonable expectancy of maintaining and entering into valid business relationships with its employees and its customers and vendors.

124.    The Individual Defendants and MICROCHIP USA knew that these business relationships were critical to DCI's business.

125.    The Individual Defendants and MICROCHIP USA knowingly, intentionally, and unjustifiably interfered with these relationships to gain an unfair advantage in the marketplace.

126.    The interference of the Individual Defendants and MICROCHIP USA was without justification or privilege, and was malicious.

127.    The actions of the Individual Defendants and MICROCHIP USA are ongoing.

128.    As a result of the tortious interference of the Individual Defendants and MICROCHIP USA, DCI has suffered, and will continue to suffer, irreparable harm and economic damages including lost profits, loss of business opportunities, and loss of goodwill and competitive advantage.

WHEREFORE, DCI respectfully requests that this Court:

(a)     Enter a permanent injunction enjoining the Individual Defendants and MICROCHIP USA, from interfering with DCI's advantageous business relationships with its employees along with its current and prospective customers and vendors;

(b)     Enter judgment in favor of DCI and against the Individual Defendants and MICROCHIP USA;

(c)     Award DCI damages, including punitive damages;

(d)     Award DCI its prejudgment interest and costs; and

(e)     Grant such other and further relief as this Court deems just and proper.

## COUNT VI – TORTIOUS INTERFERENCE WITH PLAINTIFFS' ENFORCEABLE RESTRICTIVE COVENANT AGREEMENTS (AGAINST ALL DEFENDANTS)

129.   DCI realleges and incorporates paragraphs 7-65, as if fully set forth herein.

130.   DCI has valid and enforceable restrictive covenant agreements with the Individual Defendants that prohibit them, among other things, from (i) disclosing and/or using any confidential information, except as required in the course of his or her employment with DCI; and/or (ii) competing with DCI.

131.   The Individual Defendants and MICROCHIP USA knew, or should have known, that these enforceable restrictive covenant agreements are critical to DCI's business.

132.   The Individual Defendants and MICROCHIP USA knew, or should have known, that DCI had these valid and enforceable restrictive covenant agreements.

133.   The Individual Defendants and MICROCHIP USA intentionally and unjustifiably interfered with DCI's enforceable restrictive covenant agreements by facilitating and encouraging the Individual Defendants' breaches of their respective

restrictive covenant agreements, and these actions have been wanton, reckless, and in complete disregard of DCI's rights.

134.   The interference of the Individual Defendants and MICROCHIP USA were without justification or privilege, and were malicious.

135.   The actions of the Individual Defendants and MICROCHIP USA are ongoing.

136.   As a result of the tortious interference of the Individual Defendants and MICROCHIP USA, DCI has suffered, and will continue to suffer, irreparable harm and economic damages, including lost profits, loss of business opportunities, and loss of goodwill and competitive advantage.

WHEREFORE, DCI respectfully requests that this Court:

(a)   Enter a permanent injunction enjoining the Defendants, from interfering with DCI's enforceable restrictive covenant agreements with the Individual Defendants;

(b)   Enter judgment in favor of DCI and against the Individual Defendants and MICROCHIP USA;

(c)   Award DCI damages, including punitive damages;

(d)   Award DCI its prejudgment interest and costs; and

(e)   Grant such other and further relief as this Court deems just and proper.

## COUNT VII – BREACH OF DUTY OF LOYALTY
### (Against the Individual Defendants)

137.   DCI realleges and incorporates paragraphs 7-65, as if fully set forth herein.

138.    The Individual Defendants—including, but not limited to, CENTRONE and PRUSIK—had fiduciary duties of loyalty to DCI not to actively use their respective positions for their own personal benefit, or for the benefit of other companies such as MICROCHIP USA, and/or to hinder DCI's ability to succeed in its business operations.

139.    The Individual Defendants, through their respective positions at DCI, formed relationships with DCI's employees and actual and prospective customers and vendors along with having access to DCI's confidential and/or proprietary information.

140.    Some or all of the Individual Defendants—including, but not limited to, CENTRONE—had access to or contributed to the custom and specialized code in DCI's version of the ZoHo™ platform.

141.    The Individual Defendants—including, but not limited to, CENTRONE and PRUSIK—were reposed with trust and confidence by DCI, which they each knew and voluntarily accepted.

142.    Upon information and belief, during their respective employment with DCI, the Individual Defendants breached his or duty of loyalty to DCI by misappropriating confidential information and trade secrets of DCI prior to leaving to form or work for MICROCHIP USA and/or using his or her relationships with DCI's employees and knowledge of confidential compensation information and experience in order to try to induce other DCI employees to leave DCI and follow him or her to MICROCHIP USA.

143.   Through this conduct, the Individual Defendants engaged in disloyal acts in anticipation of their future operation of or employment with MICROCHIP USA, breaching their respective duties of loyalty.

144.   As a proximate result of the Individual Defendants' respective actions, DCI has suffered and will continue to suffer damages, including punitive damages.

WHEREFORE, DCI respectfully requests that this Court:

(a)   Enter judgment in favor of DCI and against the Individual Defendants;

(b)   Award DCI actual damages, compensatory damages, and punitive damages, and costs incurred in prosecuting this action;

(c)   Award DCI its prejudgment interest; and

(d)   Grant such other and further relief as this Court deems just and proper.

## COUNT VIII – AIDING AND ABETTING THE BREACH OF DUTY OF LOYALTY
### (Against MICROCHIP USA)

145.   DCI realleges and incorporates paragraphs 7, 22-65, as if fully set forth herein.

146.   The Individual Defendants—including, but not limited to, CENTRONE and PRUSIK—breached their respective fiduciary duties of loyalty to DCI, as alleged in Count VII, above.

147.   MICROCHIP USA aided and abetted the breach of duties of loyalty owed to DCI.

148.   MICROCHIP USA had knowledge of the duties of loyalty owed to DCI based on its owners' and managers' prior employment with DCI and such individuals' intimate knowledge and awareness of DCI's business and operations, specifically including the employee relationships and confidential and/or proprietary information to which DCI employees had access.

149.   MICROCHIP USA substantially assisted and encouraged the breach of duties of loyalty by facilitating or soliciting the disloyalty and breach of trust by employing Defendants CENTRONE, BROWN, and PRUSIK's respective services to expand their sales management team.

150.   As a direct and proximate result of MICROCHIP USA's aiding and abetting the breaches of fiduciary duties, DCI has suffered damages.

WHEREFORE, DCI respectfully requests that this Court:

(a)   Enter judgment in favor of DCI and against MICROCHIP USA;

(b)   Award DCI actual damages, lost profits, loss of business opportunities, and loss of goodwill and competitive advantage; as well as other appropriate compensatory damages;

(c)   Award DCI its prejudgment interest; and

(d)   Grant such other and further relief as this Court deems just and proper.

## COUNT IX – VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (Against MICROCHIP USA)

151.   DCI realleges and incorporates paragraphs 7, 22-65, as if fully set forth herein.

152.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. § 501.204, FLA. STAT.

153.   MICROCHIP USA targeted and solicited DCI's employees who had access to confidential information and trade secrets about how DCI operates, its business strategies, customer and vendor contacts, and its internal database systems, in order to obtain such confidential information and solicit those employees to leave DCI's employ and work for or with MICROCHIP USA instead.

154.   MICROCHIP USA knew and/or should have known that that the various employees it targeted to hire or contract with, including—but not limited to—Defendants CENTRONE, BROWN, and PRUSIK, had duties of loyalty to DCI and to maintain the secrecy of DCI's trade secrets and confidential and/or proprietary information and not to disclose any protected confidential information or trade secrets to MICROCHIP USA.

155.   MICROCHIP USA hired or contracted with various DCI employees and used them to misappropriate DCI's confidential information and trade secrets and to solicit DCI's employees, customers, and vendors.

156.   MICROCHIP USA's actions are ongoing.

157.   As a direct and proximate result of MICROCHIP USA's willful, malicious, and deceptive acts and unfair trade practices, DCI has suffered, and will

36

continue to suffer, irreparable harm and economic damages, including lost profits, loss of business opportunities, and loss of goodwill and competitive advantages.

WHEREFORE, DCI respectfully requests that this Court:

(a)    Enter judgment in favor of DCI and against MICROCHIP USA;

(b)    Award DCI actual damages, lost profits, loss of business opportunities, and loss of goodwill and competitive advantage;

(c)    Award DCI punitive damages;

(d)    Award DCI its prejudgment interest; and

(e)    Grant such other and further relief as this Court deems just and proper.

DATED:  July 18, 2023        Respectfully submitted,

*/s/ John C. Getty*
**William E. Grob**; FBN: 0463124
william.grob@ogletree.com
**John C. Getty**; FBN: 1013911
john.getty@ogletree.com
OGLETREE, DEAKINS, NASH,
 SMOAK & STEWART, P.C.
100 North Tampa Street, Suite 3600
Tampa, Florida  33602
Telephone: 813-289-1247
Facsimile:  813-289-6530
*Attorneys For Plaintiff, Direct Components, Inc.*