UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DIRECT COMPONENTS, INC.,

        Plaintiff,

v.                          Case No. 8:23-cv-1617-VMC-SPF

MICROCHIP USA, LLC, et al.,

        Defendants.

_____/

**ORDER**

This matter is before the Court on consideration of Plaintiff Direct Components, Inc.'s ("DCI") Motion for Partial Summary Judgment (Doc. # 349) and Defendant Jeff Ruby's Motion for Summary Judgment (Doc. # 347), both filed on August 29, 2025. Also before the Court is DCI's Omnibus Pretrial Motion, filed October 9, 2025. (Doc. # 386). For the reasons that follow, DCI's Motion for Partial Summary Judgment is denied, Mr. Ruby's Motion for Summary Judgment is denied, and DCI's Omnibus Pretrial Motion is denied in part and deferred in part.

## I.   Background

DCI initiated this action on July 18, 2023, alleging claims against Microchip USA, LLC and thirteen of DCI's former employees and contractors: Trevor Toma, Jeff Ruby, Joshua

1

Arnold, Jake Lawless, Alexander Hart, Mitchell Kogge, Tyler Ayala, Paul Venzor, Thomas Andrew Van de Motter, Kimie Koga, John Brown, Joseph Centrone, and Michael Prusik. (Doc. # 1). Subsequently, all claims and counterclaims between DCI and Microchip USA, Trevor Toma, Joshua Arnold, Jake Lawless, Alexander Hart, Mitchell Kogge, Tyler Ayala, Paul Venzor, Thomas Andrew Van de Motter, Kimie Koga, John Brown, Joseph Centrone, and Michael Prusik (collectively, the "former defendants") were dismissed. (Doc. ## 13, 14, 310, 397, 398). Accordingly, the only remaining parties in this action are DCI and Mr. Jeff Ruby.

The operative complaint is DCI's "Second Amended Complaint for Injunctive and Other Relief," filed on May 15, 2024. (Doc. # 55). In the Second Amended Complaint, DCI asserts six claims against Mr. Ruby: (1) violation of the Defend Trade Secrets Act ("DTSA") (Count I); (2) violation of the Florida Uniform Trade Secrets Act ("FUTSA") (Count II); (3) tortious interference with DCI's advantageous business relationships (Count V); (4) tortious interference with DCI's enforceable restrictive covenant agreements (Count VI); (5) breach of duty of loyalty (Count VII); and (6) aiding and abetting the breach of duty of loyalty (Count VIII). (Id.).

Mr. Ruby filed his answer to these six claims on June 13, 2024. (Doc. # 64).

Mr. Ruby moves for summary judgment on all Counts. (Doc. # 347). DCI moves for partial summary judgment as to its claims for misappropriation of trade secrets and its purported breach of contract claim. (Doc. # 349). DCI and Mr. Ruby have responded and replied. (Doc. ## 370, 371, 383, 384). The Motions are ripe for review.

After summary judgment briefing concluded, DCI filed its Omnibus Pretrial Motion on October 9, 2025. (Doc. # 386). Among other relief, DCI asks for leave to file a third amended complaint. (Id.). The proposed third amended complaint seeks to add new factual allegations concerning Mr. Ruby (Doc. # 386-6 at 21), to add Mr. Ruby as a defendant to Count III (breach of contract) and supply allegations supporting that theory (Id. at 31–33), and to expand Count VII (breach of duty of loyalty) to include allegations against Mr. Ruby. (Id. at 41–42). Mr. Ruby has responded in opposition (Doc. # 394), and the Omnibus Pretrial Motion is ripe for review.

The Court and the parties are familiar with the allegations and evidence in this case. The Court will not outline here all the admitted and disputed facts included in the parties' Motions, although the Court has reviewed all

record evidence. Rather, the Court will address relevant record evidence within its analysis.

For now, suffice it to say that DCI, founded in 1998 by Aaron Nursey, is an independent distributor and broker of semiconductors and related electronic components operating in the secondary market. (Doc. # 401-1 at 15-19). Over the ensuing decades, DCI built its business within the secondary market by sourcing hard-to-find components from a network of vendors and selling them to manufacturers. (Id.). DCI states that it invested significant time and resources into creating searchable customer and vendor databases, pricing and market tools, and internal methodologies for sales and sourcing, all of which it maintained through confidentiality agreements, restricted access, and stored in secured cloud environments such as Google Drive. (Id.).

By 2015, DCI sought to expand its sales capabilities and engaged Mr. Ruby and his company, RedRock Leadership, to provide sales training and leadership consulting to DCI employees. (Doc. 401-2 at 6; Nursey Depo., 13:7-14). That consulting relationship continued for several years, and in June 2020, Mr. Ruby joined DCI in a full-time capacity as its Sales Director. (Doc. # 370 at 7). In that role, Mr. Ruby executed confidentiality obligations, gained access to and

administrative control over portions of DCI's Google Drive, and became a central sales leader who played a major role in supporting and closing transactions. (Doc. 401-2 at 6; Nursey Depo., 28:1-5; Doc. # 350-15; Doc. # 350-1 at 10). According to DCI, events came to a head on October 20, 2021, when DCI introduced a new commission plan. (Doc. # 408-2 at 10-13; Premsukh Depo., 32:20-41:24). DCI alleges that Mr. Ruby declined to support the new commission plan and encouraged members of DCI's sales staff to leave the workplace, which DCI characterizes as a "staged walk-out." (Id.). DCI terminated its relationship with Mr. Ruby later that day. (Id. at 13; Premsukh Depo., 44:1-5).

DCI contends that within hours of his termination, Mr. Ruby used his access privileges to restrict employee access to DCI's Google Drive containing confidential business materials. (Doc. # 350-1 at 12; Doc. 350-4). When DCI requested restoration of access, Mr. Ruby allegedly refused, stated he had deleted DCI's materials, and conditioned further cooperation on payment of a final invoice. (Doc. # 350-17). DCI maintains that later discovery revealed Mr. Ruby retained thousands of DCI files on a personal back-up device, and that metadata reflected access and modification of some materials after his separation. (Doc. ## 350-19; 350-20).

In the days following October 20, 2021, several DCI employees resigned and shortly thereafter formed or joined Microchip USA. (Doc. 404-3 at 28; Toma Depo., 108:19–109:25; 138:21–139:16). DCI alleges that Mr. Ruby was involved with Microchip USA as a sales leader, participated in its strategy development, communicated with customers, and provided or relied upon DCI's confidential and proprietary materials to support Microchip USA's launch and growth. (Id. at 73:5-8; 53:12-25; 174:3-4; 317:20-25). As a result, DCI claims millions of dollars in alleged damages for claims of misappropriation of trade secrets, tortious interference, and breach of duties of loyalty.

## II.  **Legal Standards**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving

party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder

7

evaluating the evidence could draw more than one inference
from the facts, and if that inference introduces a genuine
issue of material fact, the court should not grant summary
judgment. Samples ex rel. Samples v. City of Atlanta, 846
F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's
response consists of nothing "more than a repetition of his
conclusional allegations," summary judgment is not only
proper, but required. Morris v. Ross, 663 F.2d 1032, 1034
(11th Cir. 1981).

Finally, the filing of cross-motions for summary
judgment does not give rise to any presumption that no genuine
issues of material fact exist. Rather, "[c]ross-motions must
be considered separately, as each movant bears the burden of
establishing that no genuine issue of material fact exists
and that it is entitled to judgment as a matter of law." Shaw
Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–
39 (5th Cir. 2004); see also United States v. Oakley, 744
F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary
judgment will not, in themselves, warrant the court in
granting summary judgment unless one of the parties is
entitled to judgment as a matter of law on facts that are not
genuinely disputed . . . ." (quotation omitted)).

III. **Analysis**

    A. **Misappropriation of Trade Secrets**

    DCI moves for summary judgment on its claims against Mr. Ruby for misappropriation of trade secrets under the DTSA and FUTSA. (Doc. # 349 at 22-30).

    To establish liability under both statutes, DCI must show that it "possessed a trade secret and [that] the secret was misappropriated." Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, 898 F.3d 1279, 1297 (11th Cir. 2018) (quotation and quotation marks omitted). For purposes of the federal statute, DCI must also establish that the trade secret relates to a product or service used in, or intended for use in, interstate commerce. 18 U.S.C. § 1836(b)(1). The DTSA creates a federal cause of action that largely mirrors FUTSA, and the definitions of "trade secret" and "misappropriation" are substantially equivalent under both statutes. See Compulife Software Inc. v. Newman, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) (conducting a single analysis for DTSA and FUTSA claims). Accordingly, the Court addresses DCI's DTSA and FUTSA claims in tandem.

    1. **Existence of a trade secret**

    Florida law defines a trade secret as

> Information . . . that: (a) [d]erives independent
> economic value . . . from not being generally known
> to, and not being readily ascertainable by proper
> means by, other persons who can obtain economic
> value from its disclosure or use; and (b) [i]s the
> subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

Id. at 1311 (quoting Fla. Stat. § 688.002(4)); see also 18 U.S.C. § 1839(3). "[W]hether something is a trade secret is a question typically 'resolved by a fact finder after full presentation of evidence from each side.'" Yellowfin Yachts, 898 F.3d at 1298 (citation omitted).

DCI contends that it has developed "numerous trade secrets, including comprehensive and searchable databases containing current and prospective customer and vendor lists, contact information, order histories, pricing details, sales data, and profitability analyses; product pricing and market analyses, specialized sales training materials, call scripts, marketing templates, and internal work instructions detailing its unique sales, sourcing, and quoting processes, amongst other records." (Doc. # 349 at 3-4, ¶ 4). According to DCI, "[t]hese are precisely the categories of information that [Mr.] Ruby took and still possesses." (Id. at 24).

The Court notes that these categories of information can potentially constitute trade secrets. See Marlite, Inc. v. Eckenrod, No. 09-22607-CIV, 2011 WL 39130, at *5 (S.D. Fla.

10

Jan. 5, 2011) (collecting authority for the proposition that active customer lists and pricing information can constitute trade secrets), aff'd sub nom. Marlite, Inc. v. Am. Canas, 453 F. App'x 938 (11th Cir. 2012); Corp. Synergies Grp., LLC v. Andrews, No. CV 18-13381, 2019 WL 3780098 at *4 (D.N.J. Aug. 12, 2019) ("Customer lists, pricing information, and marketing techniques constitute trade secrets under . . . the DTSA.").

In its Motion, DCI provides evidence for one of its purported trade secrets, i.e., DCI's "Steps for Selling Success" document. (Doc. # 351-5). For the remainder of DCI's purported trade secrets, DCI does not provide citations to the record showing the specific customer and vendor lists, order histories, sales data, and other information and documents that DCI contends are trade secrets. Apart from "Steps for Selling Success," the only record citation that DCI provides to identify its trade secrets is its own interrogatory response. See (Doc. # 349 at 3-4, ¶ 4) (citing to "Ex. 1, pp. 16-17"). While that interrogatory response does name and describe the documents that DCI contends are trade secrets (Doc. # 401-1 at 9-16), the interrogatory response does not show the purported trade secrets and does not provide citations to record evidence that shows the

11

purported trade secrets. As the Court has previously stated, "the Court has no independent duty to search and consider any part of the record not otherwise referenced and pinpoint cited in the statement of material facts and response thereto." (Doc. # 40 at 3). Accordingly, for all of DCI's purported trade secrets other than "Steps for Selling Success," the Court will only consider DCI's interrogatory response for purposes of DCI's Motion. (Doc. # 401-1 at 9-16).

Considering the descriptions provided in the interrogatory response (Doc. # 401-1 at 9-16), and drawing all reasonable inferences in favor of the non-movant (Mr. Ruby), a reasonable factfinder could conclude that the documents do not constitute trade secrets because the information is generally known, readily ascertainable, or without independent economic value. For example, the interrogatory response merely describes DCI's "product pricing and market analyses" as containing information about the types of products purchased, product numbers, their value, vendor bid information, and sourcing strategies. (Id. at 9). DCI's "marketing materials" and "call scripts" are merely described as containing information about DCI's capabilities to meet customer needs, written guides for sales personnel, and email templates. (Id. at 10). With nothing

more than short, one-sentence descriptions of the purported trade secrets, DCI's interrogatory response does not establish that there are no genuine disputes as to whether the information is readily ascertainable, generally known, or independently valuable.

As to the "Steps for Selling Success," the record reflects that there are genuine disputes as to whether this document constitutes a trade secret. In his deposition, Mr. Ruby testified that (1) the information in "Steps for Selling Success" are universal sales best practices that he himself developed at RedRock Leadership (his sales training company), (2) he subsequently brought these best practices to DCI and other companies that engaged him as a contractor, (3) that the best practices are generally known, (4) and he teaches the same best practices in his RedRock "Systematic Foundation" course. (Doc. ## 403-7 at 52-61; 405-5 at 2-10; Ruby Depo., 202:13-239:21). Drawing all reasonable inferences in favor of Mr. Ruby, a reasonable factfinder could conclude that "Steps for Selling Success" does not possess independent economic value from not being generally known or readily ascertainable and, thus, does not constitute a trade secret.

Accordingly, DCI fails to establish the absence of genuine disputes regarding the existence of trade secrets.

Thus, DCI's motion for summary judgment is denied as to the existence of trade secrets.

### 2. **Misappropriation**

"One party can misappropriate another's trade secret by either acquisition, disclosure, or use." Compulife, 959 F.3d at 1311. Here, DCI contends that "the undisputed evidence shows that Ruby violated the DTSA and FUTSA by acquisition, use, and disclosure when he restricted the ability of others [to] access [] the [Google] Drive documents, kept copies of DCI's confidential and trade secret document and then used them to help" Microchip USA. (Doc. # 349 at 28). However, as discussed below, DCI fails to establish the absence of genuine disputes regarding misappropriation, and thus summary judgment is denied on this element.

*Misappropriation by Use*

First, DCI contends that Mr. Ruby misappropriated the "Steps for Selling Success" by use. DCI has presented evidence of what appears to be Mr. Ruby emailing a document titled "VTO – Microchip USA.xlsx" on November 19, 2021, to what appears to be several of the former defendants. (Doc. # 405-6 at 14). In the email, Mr. Ruby writes:

> Great meeting yesterday. What we accomplished was BIG. See the attached. I added in the proven sales process that I created for the other company. When

14

we meet on Tuesday we will create our 3-year picture and carve out our action items.

(Id.). The document, "VTO – Microchip USA.xlsx" (Id. at 15), includes a section labelled "MARKETING STRATEGY," which appears to contain language that is similar to the language contained in DCI's "Steps for Selling Success" document (Id. at 17), which DCI contends is its trade secret.

While this evidence does imply that Mr. Ruby may have used "Steps for Selling Success" in preparing Microchip USA's VTO plan, there nonetheless remain genuine disputes of material fact. A reasonable factfinder could interpret Mr. Ruby's statement of "I added in the proven sales process that I created for the other company" as referring to a company different than DCI. Indeed, Mr. Toma testified as such in his deposition. (Doc. # 404-3 at 47-48; Toma Depo., 185:24-186:-4). Furthermore, Mr. Ruby testified that he created the "universal sales best practices" contained in "Steps for Selling Success" through his company RedRock Leadership and taught the same best practices in his RedRock "Systematic Foundation" course. (Doc. ## 403-7 at 52-61, 405-5 at 2-10; Ruby Depo., 202:13-239:21). This evidence creates a genuine dispute as to whether Mr. Ruby used "Steps for Selling Success" in preparing Microchip USA's VTO plan.

Accordingly, DCI's motion for summary judgment is denied as to misappropriation by use.

### *Misappropriation by Disclosure*

Next, DCI contends that Mr. Ruby misappropriated the "Steps for Selling Success" by disclosure. DCI argues that Mr. Ruby "transmitted DCI's trade secrets — including its proprietary sales training manual, DCI Steps for Selling Success — to [Microchip USA] personnel. He did so by emailing materials directly to [Microchip USA's] leadership, including Paul Venzor." (Doc. # 349 at 29).

As an initial matter, the Court notes that misappropriation by disclosure (or use) requires DCI to show that Mr. Ruby knew or had reason to know he acquired knowledge of the alleged trade secrets under circumstances giving rise to a duty to maintain their secrecy and use. Compulife, 959 F.3d at 1311.

It is undisputed that Mr. Ruby transmitted "Steps for Selling Success" to Microchip USA personnel. The record shows that Jeff Ruby, from the email address "JRuby@RedRockLeadership.com," emailed a copy of "Steps for Selling Success" to Paul Venzor at the email address "paul@microchipusa.com" on March 16, 2022. (Doc. # 405-5 at 15). Mr. Ruby admits that this evidence shows that he

16

disclosed "Steps for Selling Success." (Doc. # 370 at 23) ("That example is a DCI document entitled 'Steps for Selling Success,' which Mr. Ruby did disclose in some form or fashion to several of his former co-Defendants.").

Nonetheless, there remains a genuine dispute as to whether Mr. Ruby's disclosure of "Steps for Selling Success" constitutes "misappropriation by disclosure." In his deposition, Mr. Ruby testified that (1) the information in "Steps for Selling Success" are universal sales best practices that he himself developed at RedRock Leadership (his sales training company), (2) he subsequently brought these best practices to DCI and other companies that engaged him as a contractor, (3) that the best practices are generally known, (4) and he teaches the same best practices in his RedRock "Systematic Foundation" course. (Doc. ## 403-7 at 52-61, 405-5 at 2-10; Ruby Depo., 202:13-239:21). Drawing all reasonable inferences in favor of Mr. Ruby, a reasonable factfinder could conclude that Mr. Ruby did not know or have reason to know that "Steps for Selling Success" was subject to a duty to maintain its secrecy.

DCI also argues that Mr. Ruby shared various DCI documents with Microchip USA through DCI's Google Drive. (Doc. # 349 at 29). Indeed, DCI presents evidence of

screenshots that appear to show that Mr. Ruby shared certain files contained within a Google Drive folder named "Direct Components Sales Team." (Doc. # 350-4 at 2; Doc. # 350-1 at 11, ¶ 31). Yet the screenshots do not identify which files specifically were disclosed, to whom they were disclosed, what the files contained, or how Mr. Ruby obtained access to them. Drawing all reasonable inferences in favor of Mr. Ruby, these screenshots do not establish that there is no genuine dispute as to whether Mr. Ruby knew or had reason to know that the files he shared were subject to a duty to maintain their secrecy.

Accordingly, DCI's motion for summary judgment is denied as to misappropriation by disclosure.

*Misappropriation by Acquisition*

"A person misappropriates a trade secret by acquisition when he acquires it and 'knows or has reason to know that the trade secret was acquired by improper means.'" Compulife, 959 F.3d at 1311 (citation omitted). "'[I]mproper means' is defined to include 'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" Id. (citation omitted).

DCI argues that Mr. Ruby "exploited insider access, in breach of his duty of confidentiality, to seize and retain control over DCI's proprietary information." (Doc. # 349 at 29). Specifically, DCI contends:

> On October 10, 2021, when DCI terminated Ruby, he immediately began taking steps to seize control of DCI's trade secrets. He restricted DCI's employees' access to the [Google] Drive, effectively holding hostage DCI's most critical documents. When DCI's management requested that access be restored, Ruby refused unless his final invoice was paid. Even though DCI assured Ruby the invoice would be paid and stressed the urgency of restoring access to documents that were "extremely important company documents," Ruby continued to withhold them. Only after DCI issued payment did Ruby send a copy of the files to DCI, and even then he falsely represented that the thumb drive he provided contained the only copy of the materials. In actuality, Ruby retained his own copies.

(Id. at 28-29) (citations omitted).

There remains a genuine dispute as to whether Mr. Ruby acquired the Google Drive files by "improper means." On August 1, 2025, Robert Rohr (Mr. Ruby's retained digital forensic analyst) submitted a declaration that analyzed the metadata of the Google Drive. (Doc. # 325-2 at 5-8). Mr. Rohr concluded that Mr. Ruby did not have the requisite ownership permissions to control access to the files in question, but that instead the files were owned and controlled by DCI. (Id.). Further, Mr. Rohr concluded that Mr. Ruby's access to the files was

contingent on the sharing permissions that DCI had granted to Mr. Ruby. (Id.). Drawing all reasonable inferences in favor of Mr. Ruby, a reasonable factfinder could conclude that Mr. Ruby's acquisition of the Google Drive files was not done by improper means.

Accordingly, DCI's motion for summary judgment is denied as to misappropriation by acquisition.

**B. Breach of Contract and Breach of Duty of Loyalty; DCI's motion to amend**

Next, DCI moves for summary judgment on its purported breach of contract claim against Mr. Ruby. (Doc. # 349 at 15-22). In response, Mr. Ruby argues that DCI cannot obtain summary judgment on such a claim because the Second Amended Complaint does not assert a breach of contract claim against him. (Doc. # 370 at 12). Similarly, Mr. Ruby moves for summary judgment on Count VII (breach of duty of loyalty), contending that the Second Amended Complaint lacks allegations directed at him. (Doc. # 347 at 30-31).

After these motions were filed, DCI filed its Omnibus Pretrial Motion on October 9, 2025. (Doc. # 386). Among other relief, DCI asks for leave to file a third amended complaint. (Id.). The proposed third amended complaint seeks to add new factual allegations concerning Mr. Ruby (Doc. # 386-6 at 21),

20

to add Mr. Ruby as a defendant to Count III (breach of
contract) and supply allegations supporting that theory (Id.
at 31–33), and to expand Count VII (breach of duty of loyalty)
to include allegations against Mr. Ruby. (Id. at 41–42).
Notably, DCI filed this request to amend only after discovery
closed and after briefing on summary judgment concluded.

    Because both parties' summary judgment arguments turn on
what was, and was not, pled in the Second Amended Complaint,
the Court addresses the Motions in conjunction with DCI's
request for leave to amend.

### 1. **DCI's request to amend the complaint**

    "[B]ecause [DCI]'s motion to amend was filed after the
scheduling order's deadline, [DCI] must first demonstrate
good cause under Rule 16(b) before [the Court] will consider
whether amendment is proper under Rule 15(a)." Sosa v.
Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998). "A
party seeking the extension of an already-expired scheduling
order deadline must show both good cause and excusable
neglect." Payne v. C.R. Bard, Inc., 606 F. App'x 940, 944
(11th Cir. 2015). "In determining whether a party has shown
excusable neglect warranting an extension, a court must
consider all pertinent circumstances, including the danger of
prejudice to the nonmovant, the length of the delay and its

potential impact on judicial proceedings, the reason for the
delay, including whether it was within the reasonable control
of the movant, and whether the movant acted in good faith."
Id. (internal quotations omitted).

DCI argues that it should be permitted to amend the
Second Amended Complaint "merely to comport with the facts
revealed during discovery." (Doc. # 386 at 24). Notably, the
only claim that DCI explicitly discusses in its motion to
amend is the breach of contract claim. See (Id.) (stating
that Mr. Ruby "understood DCI alleged against him claims for
breach of contract in this lawsuit" and that "DCI's breach of
contract claim is not just actionable, rather than futile, it
is so clear as to justify entry of summary judgment for
DCI."). This is despite the fact that DCI's proposed third
amended complaint also seeks to amend portions of the Second
Amended Complaint beyond the breach of contract claim. See
(Doc. # 386-6 at 41-42) (seeking to add allegations to the
complaint against Mr. Ruby under Count VII, breach of duty of
loyalty).

As to DCI's argument that it seeks to "merely to comport
with the facts revealed during discovery," it appears that
DCI is referencing the events of June 2025. (Doc. # 349 at 9-
10, ¶ 32-34). According to DCI, Mr. Ruby had repeatedly

represented that he had no copies of any DCI records. (Id. at
9, ¶ 32). However, on June 5, 2025, DCI conducted a review of
its Google Drive logs, which revealed that Mr. Ruby had
accessed, shared, changed access permissions, and restricted
access to files that allegedly contained DCI's confidential
information. (Id. at 19). On June 9, 2025, DCI sent a letter
to Mr. Ruby's counsel, arguing that Mr. Ruby had violated
several discovery obligations in failing to disclose his
possession and control of DCI's Google Drive files. (Doc. #
386-7 at 19). On June 18, 2025, Mr. Ruby produced
"approximate[ly] 1,745 files (or 8,579 pages) of DCI files"
that were stored on Mr. Ruby's back-up drive. (Doc. # 349 at
10; Doc. # 386 at 8).

As an initial matter, DCI's argument is unpersuasive
because it references only the Rule 15(b)(2) standard for
amending pleadings. Though Rule 15(b)(2) does provide for
amendment of pleadings "to conform them to the evidence," the
Eleventh Circuit has held that Rule 15(b)(2) does not apply
before trial. Blue Cross & Blue Shield of Alabama v. Weitz,
913 F.2d 1544, 1550 (11th Cir. 1990) ("Fed. R. Civ. Pro. 15(b)
is inapposite where, as here, there was no trial because the
district court decided the case at the summary judgment
stage.").

DCI has shown neither the good cause nor excusable neglect required by Rule 16(b). Good cause requires showing that the deadline in question could not be met "despite the diligence of the party seeking the extension." Sosa, 133 F.3d at 1418. Here, the "newly discovered evidence" of Mr. Ruby's continued possession of DCI's Google Drive files was first made known to DCI in June 2025. (Doc. # 386 at 8). Yet DCI waited until after discovery closed on August 7 and after summary judgment briefing concluded on October 3 before finally seeking amendment of the complaint on October 9, 2025. (Doc. # 386). In essence, DCI delayed nearly four months before seeking amendment to add Mr. Ruby to its breach of contract claim, and in the meantime, DCI moved for summary judgment on the very claim that it later acknowledged required amendment. This delay was entirely within DCI's control, and DCI offers no persuasive explanation for failing to seek amendment earlier before the close of discovery or before the dispositive motions deadline.

Allowing DCI to amend its complaint to assert a breach of contract claim against Mr. Ruby at this late stage would prejudice Mr. Ruby by expanding the claims against him after he has already completed discovery and litigated dispositive motions based on the existing pleadings. Amendment would also

significantly disrupt the orderly administration of this case
by effectively reopening pleadings and, necessarily,
discovery and motion practice. Courts routinely deny
amendment under these circumstances. See Lowe's Home Centers,
Inc. v. Olin Corp., 313 F.3d 1307, 1315 (11th Cir. 2002)
("[I]t is not an abuse of discretion for a district court to
deny a motion for leave to amend following the close of
discovery, past the deadline for amendments and past the
deadline for filing dispositive motions.").

Accordingly, DCI's request for leave to file third
amended complaint within its Omnibus Pretrial Motion (Doc. #
386) is denied.

## 2. **Breach of Contract**

In its Motion for Summary Judgment, DCI states that "the
[Second Amended Complaint] includes several counts against
Ruby, including . . . breach of contract (Count III)." (Doc.
# 347 at 14). However, as Mr. Ruby rightfully points out,
"Mr. Ruby is not named in Count III of the operative Complaint
— not in the title, and not in any of the allegations." (Doc.
# 370 at 8). Indeed, Count III of the Second Amended Complaint
refers to former defendants Toma, Hart, Arnold, Koga, Venzor,
and Prusik. (Doc. # 55 at 31-33). Mr. Ruby is not mentioned
in Count III at all.

25

Nonetheless, DCI argues that "[t]he fact that DCI's Second Amended Complaint does not name Ruby in Count III does not affect DCI's entitlement to summary judgment." (Doc. # 349 at 17). DCI cites to Sams v. United Food & Commercial Workers International Union, 866 F.2d 1380, 1384 (11th Cir. 1989), for the proposition that "a complaint need not specify in detail the precise theory giving rise to recovery." Further, DCI contends that the Federal Rules of Civil Procedure "require only that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests," and that Mr. Ruby has been "on notice." (Doc. # 349 at 17–18).

The Court is not persuaded by DCI's arguments. The Eleventh Circuit has "explained that under Rule 8(a)(3), any pleading that sets forth a claim must include a 'concise statement identifying the remedies and *the parties against whom relief is sought*.'" Cohen v. Office Depot, Inc., 184 F.3d 1292, 1297 (11th Cir. 1999), vacated in part on other grounds, 204 F.3d 1069 (11th Cir. 2000) (quoting Goldsmith v. City of Atmore, 996 F.2d 1155, 1161 (11th Cir. 1993)) (emphasis added). Indeed, the Eleventh Circuit acknowledged "Rule 8(a)(3)'s express and unambiguous direction that the plaintiff include a demand for relief in her pleadings."

26

Cohen, 184 F.3d at 1298. Accordingly, a pleading does not state a claim if it fails to identify the party against whom relief is sought. See American Home Assurance Co. v. Phineas Corp., 347 F. Supp. 2d 1231, 1240 (M.D. Fla. 2004) ("[I]n light of the Plaintiff's clear failure to include a claim for relief for breach of contract against any Defendant other than Phineas in count one of the amended complaint, it was error for this Court to enter judgment against the other Defendants as to count one."); Barkett v. Hardy, 571 So.2d 13, 14 (Fla. 2d DCA 1990) ("Entering judgment against a defendant not named in the pertinent pleading is clear error.").

As DCI itself acknowledges, "DCI removed Ruby's name from Count III and filed the Second Amended Complaint . . . ." (Id.). Yet, DCI contends that Mr. Ruby could still "discern his liability for breach of contract." (Id.). To the contrary, the Court concludes that because DCI did not identify Mr. Ruby in Count III of the Second Amended Complaint, DCI failed to comply with Rule 8(a)(3)'s requirement to identify the parties against whom relief is sought. As the Eleventh Circuit has recognized, "[l]iberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in

the complaint. The proper procedure . . . to assert a new
contract claim was to seek to amend her complaint." Gilmour
v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004)
(citation omitted).

Accordingly, because the Second Amended Complaint does
not assert a breach of contract claim against Mr. Ruby, the
Court cannot grant summary judgment on that purported claim.
Thus, DCI's motion for summary judgment is denied as to the
purported breach of contract claim against Mr. Ruby.

### 3. **Breach of Duty of Loyalty**

Having resolved all arguments from DCI's Motion for
Partial Summary Judgment, the Court now addresses the
arguments raised in Mr. Ruby's Motion for Summary Judgment.

In the Second Amended Complaint, Count VII asserts a
claim for breach of the duty of loyalty against Mr. Ruby.
(Doc. # 55 at 39). But Count VII contains no factual
allegations describing any conduct by Mr. Ruby. (Id. at 39-
41). In fact, beyond identifying him in the caption of the
Count, the allegations numbered under Count VII are entirely
silent as to Mr. Ruby. (Id.). Nonetheless, Mr. Ruby answered
Count VII and denied all allegations. (Doc. # 64 at 12).

A complaint need only contain a concise statement
identifying the remedies and the parties against whom relief

is sought. <u>Cohen</u>, 184 F.3d at 1297. Here, the Second Amended
Complaint specifically identified Count VII as against Mr.
Ruby. (Doc. # 55 at 39). Mr. Ruby specifically answered Count
VII and denied all allegations thereunder. (Doc. # 64 at 12).
Further, Mr. Ruby conducted discovery on Count VII. (Doc. #
372-1 at 199) (showing Mr. Ruby's interrogatory requesting
DCI to "[i]dentify precisely, separately, and distinctly
every action or inaction that you contend breached my duty of
loyalty to DCI."). Accordingly, these facts indicate that Mr.
Ruby was on notice that the Second Amended Complaint asserted
a breach of duty of loyalty claim against him.

Having concluded that the Second Amended Complaint
includes a claim for breach of duty of loyalty against Mr.
Ruby, the Court now turns to Mr. Ruby's motion for summary
judgment on that claim. Here, genuine disputes of material
fact preclude summary judgment for Mr. Ruby on the breach of
duty of loyalty claim. DCI has presented evidence that Mr.
Ruby was subject to a duty of loyalty as a sales director and
leader at DCI. (Doc. # 408-2 at 44; Premsukh Depo., 167:22-
168-4). DCI has also presented evidence that Mr. Ruby
restricted access to DCI's Google Drive containing
confidential business materials and retained thousands of DCI
files on a personal back-up device. (Doc. ## 350-1 at 12;

Doc. 350-4; 350-19; 350-20). DCI's corporate representative testified that Mr. Ruby "staged a walkout" of DCI employees around October 20, 2021. (Doc. 408-2 at 15; Premsukh Depo., 50:17-18). In addition, DCI has presented evidence of what appears to be Mr. Ruby emailing a document titled "VTO – Microchip USA.xlsx" on November 19, 2021, to several of the former defendants. (Doc. # 405-6 at 14). In the email, Mr. Ruby writes :

> Great meeting yesterday. What we accomplished was BIG. See the attached. I added in the proven sales process that I created for the other company. When we meet on Tuesday we will create our 3-year picture and carve out our action items.

(Id.). Furthermore, DCI has presented evidence that Mr. Ruby, on behalf of Microchip USA, engaged in sales meetings and discussions with certain DCI customers during the period immediately following his departure from DCI and the formation of Microchip USA. (Doc. # 355-7).

Drawing all reasonable inferences in favor of DCI, a reasonable factfinder could conclude that Mr. Ruby breached a duty of loyalty owed to DCI by misappropriating its confidential information or creating a competing business with the former defendants. These theories of liability are the same theories of liability that DCI articulated under Count VII of the Second Amended Complaint (Doc. # 55 at 40)

and reiterated to Mr. Ruby in discovery. <u>See</u> (Doc. # 372-1 at 205-13). Though Count VII does not list Mr. Ruby in the allegations, Mr. Ruby was on notice of the claim asserted against him in Count VII as he specifically answered Count VII and denied all of the allegations thereunder. Furthermore, the Second Amended Complaint supplies various allegations that articulate DCI's theory of Mr. Ruby's breach of duty of loyalty by way of misappropriation or inducement of DCI employees to form a competitor business. (Doc. # 55 at 20, ¶ 70-73). And, as discussed above, the summary judgment record provides evidence from which a reasonable fact finder could find in favor of DCI on the same allegations and theories of liability articulated in the Second Amended Complaint.

Accordingly, Mr. Ruby motion for summary judgment is denied as the breach of duty of loyalty claim.

C. **<u>Tortious Interference</u>**

Next, Mr. Ruby argues that he is "entitled to summary judgment on DCI's tortious interference with advantageous business relationships claim" because "DCI does not have sufficient evidence that Mr. Ruby's supposed tortious interference caused any damages DCI may have suffered." (<u>Id.</u> at 22).

31

"The elements of tortious interference with a business
relationship are (1) the existence of a business relationship
. . . (2) knowledge of the relationship on the part of the
defendant; (3) an intentional and unjustified interference
with the relationship by the defendant; and (4) damage to the
plaintiff as a result of the breach of the relationship."
Ethan Allen, Inc. v. Georgetown Manor, Inc., 647 So. 2d 812,
814 (Fla. 1994) (citation and quotation marks omitted). "A
protected business relationship need not be evidenced by an
enforceable contract." Id. "However, the alleged business
relationship must afford the plaintiff existing or
prospective legal or contractual rights." Id. (citation and
quotation marks omitted).

Here, the record reflects genuine disputes as to whether
Mr. Ruby's alleged interference caused damages to DCI.

DCI has presented evidence of the amount of business DCI
conducted with a sample of nine "overlapping customers" (i)
before and while Ruby was employed by DCI (2019 through
October 9, 2021), (ii) within the three months Ruby and the
former defendants were allegedly forming Microchip USA
(October 10, 2021 through December 31, 2021), and (iii) after
Microchip USA became operational (2022-2023). (Doc. # 372-
4). In addition, DCI has presented evidence of Microchip USA's

invoices, starting in November 2021, to certain "overlapping customers" for sales of Microchip USA's products. (Doc. # 355-7). Alongside these invoices, DCI presents evidence of Mr. Ruby (in conjunction with other former defendants) conducting sales meetings by Microsoft Teams and sales discussions by email on behalf of Microchip USA with specific contacts at "overlapping customers" during the months of November 2021 through January 2022. (Id.). In addition, DCI presents evidence that DCI was conducting sales discussions by email with the same contact persons representing the same "overlapping customers" just a few months before Mr. Ruby's meetings and discussions with those contacts. (Id.).

Drawing all reasonable inferences in favor of DCI, a reasonable factfinder could conclude that DCI had protectable business relationships with at least some of the overlapping customers, and that Mr. Ruby's alleged interference caused damages in the form of DCI's lost business with those customers. Accordingly, Mr. Ruby's motion for summary judgement is denied as to the tortious interference with advantageous business relationships claim.

D. **Damages**

Finally, Mr. Ruby argues that he is "entitled to summary judgment on all of DCI's claims because DCI does not have

sufficient evidence of damages." (Doc. # 347 at 4).
Specifically, Mr. Ruby's argument is predicated on the Court
excluding certain of DCI's damages computations under Rule
37. (Doc. # 347 at 4-22). Thus, Mr. Ruby's summary judgment
argument on damages is twofold. First, he asks the Court to
sanction DCI by excluding its damages computation under Rule
37. Then, assuming the Court rules favorably on that request,
Mr. Ruby seeks summary judgment because of the lack of
evidence of DCI's damages. However, because Mr. Ruby's
argument fails on the first request, summary judgment is not
proper.

1. **<u>Mr. Ruby's request to exclude DCI's Lost Profit
Damages Computation</u>**

The Court begins with Mr. Ruby's request to exclude DCI's
evidence of damages.

The Federal Rules of Civil Procedure required DCI to
provide Mr. Ruby with information about its claim for damages.
Under Rule 26(a)(1)(A)(iii), a party must, without awaiting
a discovery request, provide "a computation of each category
of damages claimed" and must also make available for
inspection and copying the documents or other evidentiary
material on which each computation is based. Under Rule 26(e),
a party who makes a disclosure under Rule 26(a) must

34

supplement its disclosure in a timely manner if the party learns the initial disclosure is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. Rule 37 enforces the disclosure requirements of Rule 26. Under Rule 37(c), if a party fails to provide information as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In other words, the Court must exclude that information if the Rule 26 violation was not substantially justified or harmless.

"An individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'" In re Delta/AirTran Baggage Fee Antitrust Litig., 846 F. Supp. 2d 1335, 1358 (N.D. Ga. Feb. 3, 2012) (quoting Devaney v. Cont'l Am. Ins. Co., 989 F.2d 1154, 1163 (11th Cir. 1993)). Discovery conduct is harmless "if it is honest [] and is coupled with the other party having sufficient knowledge that the material has not been produced." Id. (quoting Go Med. Indus. Pty, Ltd.

v. Inmed Corp., 300 F. Supp. 2d 1297, 1308 (N.D. Ga. 2003)).
Whether the opposing party suffered prejudice underlies the
harmlessness determination. See Hewitt v. Liberty Mut. Grp.,
Inc., 268 F.R.D. 681, 683 (M.D. Fla. 2010). "Prejudice
generally occurs when late disclosure deprives the opposing
party of a meaningful opportunity to perform discovery and
depositions related to the documents or witnesses in
question." Berryman-Dages v. City of Gainesville, No. 1:10-
cv-177-MP-GRJ, 2012 WL 1130074 at *2 (N.D. Fla. Apr. 4, 2012).
The untimely party bears "[t]he burden of establishing that
a failure to disclose was substantially justified or
harmless." Mitchell v. Ford Motor Co., 318 F. App'x 821, 824
(11th Cir. 2009) (quoting Leathers v. Pfizer, Inc., 233 F.R.D.
687, 697 (N.D. Ga. 2006)). At the same time, "[t]he district
court has broad discretion in determining whether a violation
is justified or harmless" under Rule 37. Abdulla v. Klosinski,
898 F. Supp. 2d 1348, 1359 (S.D. Ga. 2012) (citation omitted).

On October 13, 2023, DCI provided Mr. Ruby with DCI's
"Initial Disclosure." (Doc. # 347-2). DCI's Initial
Disclosure did not provide a computation of any category of
damages. (Id. at 7-8). Plainly, DCI's Initial Disclosure was
incomplete because it did not comply with Rule
26(a)(1)(A)(iii)'s requirement to provide a computation of

each category of damages claimed. Accordingly, since October 13, 2023, DCI was obligated by Rule 26(e) to supplement its Initial Disclosure in a timely manner to provide Mr. Ruby with a computation of each category of damages claimed.

On August 7, 2025, at 9:48 p.m. on the final day of the discovery period, DCI provided Mr. Ruby with its "Amended Initial Disclosure." (Doc. # 350-24). There, DCI provided, for the first time, a new purported damages computation: $7,859,108 in lost profits. That figure is based on "Exhibit 2 and 3" of the Amended Initial Disclosure, which calculates DCI's profit margin for 2022-2025 and applies it against the sales of Microchip USA to overlapping customers identified in the parties' escrow process. (Id. at 26-27).

Mr. Ruby argues that DCI should be precluded from pursuing lost profit damages because DCI did not disclose the lost profit computation until August 7, 2025, the last day of discovery. (Doc. # 347 at 9). In essence, Mr. Ruby contends that DCI's lost profit damages computation is an untimely supplement under Rule 26(e). Further, Mr. Ruby argues that DCI's untimely damages disclosure must be excluded under Rule 37(c) because DCI's failure to timely disclose its lost profit computation was not substantially justified or harmless. (Id. at 20). According to Mr. Ruby, the untimely disclosure

prevented him from engaging in meaningful discovery of DCI's purported lost profit damages. (Id.).

DCI does not appear to dispute that its lost profit computation was untimely disclosed. (Doc. # 371 at 5-9). Indeed, it would be difficult for DCI to do so. Since filing its Initial Disclosure in October 2023, more than 660 days passed before DCI provided a computation of lost profits. Indeed, Rule 26(e) requires a party to supplement its initial disclosure in a *timely manner* if there is any incomplete information. Plainly, DCI did not provide the lost profit computation in a timely manner by delivering it nearly two years later in the final hours of discovery. Nonetheless, DCI argues that its lost profit computation should not be excluded because its untimely disclosure was substantially justified and harmless. (Id.).

First, DCI argues that the untimely disclosure was harmless because "there is ample time to prevent any conceivable risk of surprise or prejudice to Ruby without disrupting the trial, as the trial is not scheduled to begin until February 2026 (nearly five months after)." (Doc. # 371 at 8). Implicit in DCI's argument is the implication that the harmfulness of DCI's untimely disclosure could be cured if the Court reopened discovery so that Mr. Ruby can conduct

discovery on DCI's lost profit computation. Indeed, this implicitly acknowledges that Mr. Ruby was in fact prejudiced by DCI's untimely disclosure, as Mr. Ruby was deprived of a meaningful opportunity to perform discovery and depositions related to the lost profit computation.

There is no doubt that further extending discovery would further prejudice Mr. Ruby. Discovery in this case has dragged on for nearly two years, and has been extended seven times, not including several other Court-authorized discovery extensions of limited scope. See (Doc. ## 49, 79, 149, 171, 190, 210, 301). Extending the discovery period again would only serve to prolong this case further. As the Court stated in its September 26, 2025 Order, "[t]he Court will not extend the discovery deadline any further." (Doc. # 376). Without the ability to conduct discovery on the lost profit computation, Mr. Ruby is clearly prejudiced by DCI's untimely disclosure. Accordingly, the Court cannot conclude that DCI's untimeliness was harmless.

Second, DCI argues that its untimely disclosure was substantially justified because its lost profit computation essentially relies on Microchip USA's financial records, which were produced to DCI only in late July 2025. (Doc. # 371 at 8). Indeed, DCI's lost profit calculation is based

upon applying DCI's profit margin against Microchip USA's
revenue from customers who purchased electronic components
from both DCI and Microchip USA (i.e., overlapping
customers). (Doc. # 350-24 at 26-27). To identify the
overlapping customers, the parties collectively participated
in a months-long escrow process, whereby the parties
submitted their customer data and financial records to a
third-party. (Doc. # 349 at 13). As DCI explains, and Mr.
Ruby admits, Microchip USA only produced the finalized
account summaries for overlapping customers on July 22, 2025.
(Doc. # 371-5 at 13) (showing the delivery of documents
labelled "Microchip 00001550 – Microchip 00001684"). As DCI's
lost profit calculation shows, it is these documents upon
which the lost profit computation was based. (Doc. # 348-11
at 2).

The Court acknowledges the commentary to Rule 26(a),
which provides that "a party would not be expected to provide
a calculation of damages which . . . depends on information
in the possession of another party or person." Fed. R. Civ.
P. 26(a)(1)(C) Notes of Advisory Committee on Rules – 1993
Amendment. Indeed, DCI's computation of lost profits depended
on information in Microchip USA's possession, and the
relevant information came into DCI's possession only on July

22, 2025, when Microchip USA produced the documents labelled

"Microchip 00001550 - Microchip 00001684." Within 16 days

later, DCI provided the lost profit computation to Mr. Ruby.

On these facts, the Court concludes that DCI's untimely

disclosure was substantially justified. The record

demonstrates that the timing of DCI's lost profit computation

disclosure was driven not by gamesmanship or bad faith, but

by the practical realities of the parties' escrow process and

the delayed availability of financial data uniquely within

Microchip USA's control. Once DCI obtained the relevant

financial information from Microchip USA, DCI produced its

lost profit damages computation to Mr. Ruby in a reasonable

timeframe of 16 days.

Accordingly, because DCI's delayed lost profit

computation disclosure was substantially justified, the lost

profit computation is not excluded by Rule 37.

### 2. **DCI's Evidence of Damages**

The Court now turns to Mr. Ruby's argument that DCI has

insufficient evidence of damages for its claims of trade

secret misappropriation, tortious interference, and duty of

loyalty.

Under the DTSA and FUTSA, a court may award damages for actual loss or unjust enrichment.[1] See 18 U.S.C. § 1836(b)(3)(B); Fla. Stat. § 688.004(1). Courts have taken various approaches to defining "actual loss" or "unjust enrichment" in trade secret cases, but have consistently recognized that the plaintiff's lost profits are an appropriate measure of damages. See Geodetic Services, Inc. v. Zhenghzou Sunward Tech. Co. Ltd., No. 8:13-cv-1595-MSS-TBM, 2014 WL 12620804 at *6 (M.D. Fla. Apr. 4, 2014) ("'Actual loss' can include 'loss of profits, lost customers or lost market share to the owner of the trade secret caused by the misappropriation.'" (citation omitted)); Healthplan Services, Inc. v. Dixit, No. 8:18-cv-2608-SDM-AAS, 2021 WL 4927434 at *5 (M.D. Fla. May 27, 2021) (noting unjust enrichment can include "value of the plaintiff's lost profits, the defendant's actual profits from the use of the trade secret, the value a reasonably prudent investor would have paid for the trade secret, the developmental costs the defendant avoided by the misappropriation, and a reasonable

---

[1] In lieu of actual loss or unjust enrichment, a court may also award damages measured by imposition of a reasonable royalty for use or disclosure of the trade secret. 18 U.S.C. § 1836(b)(3)(B); Fla. Stat. § 688.004(1).

royalty"), report and recommendation adopted, No. 8:18-cv-2608-SDM-AAS, 2021 WL 4926752 (M.D. Fla. July 22, 2021).

Lost profits are also recoverable as damages for DCI's claims for tortious interference and aiding and abetting the breach of duty of loyalty. See Tymar Distribution LLC v. Mitchell Grp. USA, LLC, 558 F. Supp. 3d 1275, 1285 (S.D. Fla. 2021) ("Lost profits are certainly compensatory damages. And in claims with no underlying transaction, such as business torts, lost profits are often directly caused by a defendant's wrongful act and recoverable simply as compensatory damages." (citations omitted)).

"[L]ost profit damages are recoverable if there is 'some standard by which the amount of damages may be adequately determined.'" Nebula Glass Intern., Inc. v. Reichhold, Inc., 454 F.3d 1203, 1217 (11th Cir. 2006) (quoting W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd., 545 So.2d 1348, 1350-51 (Fla. 1989)). "[U]ncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages." Id. Indeed, "the uncertainty which defeats recovery in such cases is the cause of the damage rather than the amount." Id. (quoting W.W. Gay, 545 So.2d at 1350-51) (quotation marks omitted).

Here, DCI's lost profit computation (Doc. # 350-24)
creates a genuine dispute of material fact as to its damages
for each of its claims. Even apart from the lost profit
computation itself, DCI has presented other evidence of lost
profits that create a genuine dispute of material fact as to
its damages for each of its claims.

First, DCI's chief executive officer and founder, Aaron
Nursey, testified that DCI has "somewhere around a 50 percent
profit margin." (Doc. # 408-2 at 43, Nursey Depo., 161:15-
16). Further, DCI has presented some of its financial
statements that indicate its annual gross profit, operating
income, and net income, and the respective profit margins.
(Doc. # 405-3 at 22).

Next, DCI has identified hundreds of "overlapping
customers," i.e., businesses that have historically purchased
products from DCI and have subsequently purchased products
from Microchip USA starting in late 2021 and early 2022. (Doc.
# 405-7). DCI has also presented evidence of Microchip USA's
invoices, starting in November 2021, to certain "overlapping
customers" for sales of Microchip USA's products. (Doc. #
355-7). Alongside these invoices, DCI presents evidence of
Mr. Ruby conducting sales meetings by Microsoft Teams and
sales discussions by email on behalf of Microchip USA with

specific contacts at "overlapping customers" during the
months of November 2021 through January 2022. (Id.). DCI was
conducting sales discussions by email with the same contact
persons representing the same "overlapping customers" just a
few months before Mr. Ruby's meetings and discussions with
those contacts. (Id.).

In addition, DCI has presented evidence of what appears
to be Mr. Ruby emailing a document titled "VTO – Microchip
USA.xlsx" on November 19, 2021, to several of the former
defendants, including Hart, Van De Motter, Lawless, Arnold,
Kogge, Venzor, and Toma. (Doc. # 405-6 at 14). In the email,
Mr. Ruby writes :

> Great meeting yesterday. What we accomplished was
> BIG. See the attached. I added in the proven sales
> process that I created for the other company. When
> we meet on Tuesday we will create our 3-year picture
> and carve out our action items.

(Id.). The document, "VTO – Microchip USA.xlsx" (Id. at 15),
includes a section labelled "MARKETING STRATEGY," which
appears to contain language that is similar to that contained
in DCI's "Steps for Selling Success" document. (Id. at 17).

Finally, Mr. Ruby admits that from the early 2010s until
2022, Mr. Ruby had a "Synology NAS device" backup drive (the
"Ruby Back-up Drives") that automatically synced with his
computer. (Doc. # 370 at 5-6, ¶ 33). According to Mr. Ruby,

he only realized in January 2025 that the Ruby Back-up Drives
contained various documents "dating from his time at DCI."
(Id.). Indeed, the undisputed facts show that the Ruby Back-
up Drives contained "approximately 1,745 files, which
represented 8,579 pages, of DCI files," which included
"copies of files and folders . . . such as DCI spreadsheets
that contain customer names, contact information,
profitability data, and part order history, as well as DCI
sales training materials, strategy and pricing documents, and
employee profiles." (Doc. # 349 at 10-11, ¶¶ 34-41; Doc. #
370 at 6, ¶¶ 34-41). On August 27, 2025, Mr. Ruby produced a
list of files stored on the Ruby Back-up Drives, which showed
that he continued to possess thousands of files that appear
to be copies from DCI's cloud storage. (Doc. # 349 at 10-11,
¶¶ 34-41). The list produced by Mr. Ruby appears to show that
hundreds of these files on the Ruby Back-up Drives were
modified, accessed, or changed at some point after Mr. Ruby's
separation from DCI on October 20, 2021. (Id.).

Drawing all reasonable inferences in favor of DCI, a
reasonable factfinder evaluating this evidence could conclude
that DCI's lost profits could be estimated by applying DCI's
profit margin against the value of Microchip USA's invoices
to "overlapping customers." Further, a reasonable factfinder

could conclude that those lost profits are a consequence of either (1) the alleged misappropriation of "Steps for Selling Success" into Microchip USA's VTO plan, (2) the alleged interference with customer relationships, or (3) the alleged aiding of the former defendants' alleged breaches of loyalty.

Nonetheless, Mr. Ruby argues alternatively that DCI's lost profit computation is improper because no reasonable factfinder could conclude that "but for the wrongdoing of Mr. Ruby (and his former co-Defendants), every sale made by Microchip for some number of years and/or category of customers would have instead been made by DCI." (Doc. # 347 at 17). Indeed, DCI's CEO testified that DCI has "thousands" of competitors other than Microchip USA. (Doc. # 408-2 at 44, Nursey Depo., 166:12-19).

Mr. Ruby's argument improperly demands direct proof that each specific sale would have been awarded to DCI if they had not gone to Microchip USA. The law imposes no such burden. Importantly, "'[q]uestions regarding the reasonableness and quantification of damages are generally issues of fact.' Therefore, the jury — rather than the Court on summary judgment — should weigh the evidence and resolve at trial all factual questions relating to consequential damages." Nature's Products, Inc. v. Natrol, Inc., 990 F. Supp. 2d 1307,

1315 (S.D. Fla. 2013) (quoting <u>Exim Brickell LLC v. PDVSA Servs. Inc.</u>, 516 F. App'x 742, 759 (11th Cir. 2013)); <u>see also</u> <u>Slip-N-Slide Records, Inc. v. TVT Records, LLC</u>, No. 05-21113-CIV, 2007 WL 3232274, at *12 (S.D. Fla. Oct. 31, 2007) ("Proof of the amount of damages need not conform to any particular methodology, and exact proof of the amount of damages is not required.").

Here, the evidence in the record shows a continuity of DCI's customer relationships, a diversion of customer sales to Microchip USA, and a direct overlap between the DCI's historical business and Microchip USA's subsequent revenue. Drawing all inferences in favor of DCI, a reasonable factfinder may infer causation and quantify loss by (1) relying on DCI's lost profit computation, or (2) applying DCI's historical profit margin to the revenue diverted to Microchip USA. Thus, on this record, DCI has sufficient evidence of damages to proceed to trial.

Accordingly, Mr. Ruby's motion for summary judgment as to damages is denied.

### 3. **DCI's Other Damages Computations**

In addition to challenging DCI's lost profit computation, Mr. Ruby challenges two other damages computations produced by DCI. Namely, Mr. Ruby contends that

48

DCI is not entitled, as a matter of law, to (1) "the supposed amount it spent to advertise, hire, and replace the sales team employees" (Doc. # 347 at 24), and (2) "supposed amount [at which] it values the information contained in its confidential databases." (Doc. # 347 at 10).

As discussed above, Mr. Ruby's motion for summary judgment is denied because the Court has concluded that DCI has sufficient evidence of damages. Accordingly, there is no need for the Court to rule on the propriety of specific damages computations at this summary judgment stage. Indeed, "nothing requires a court to decide a non-case-dispositive issue raised in a summary judgment motion if a trial may ultimately moot the issue." Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co., No. 2:21-CV-41-KCD, 2024 WL 69509 at *1 (M.D. Fla. Jan. 5, 2024) (citations omitted); see also Fed. R. Civ. P. 56(a) (summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  DCI's Motion for Partial Summary Judgment (Doc. # 349)

is **DENIED.**

(2)  Defendant Jeff Ruby's Motion for Summary Judgment (Doc.

# 347) is **DENIED.**

(3)  DCI's Omnibus Pretrial Motion (Doc. # 386) is **DENIED** in

part as set forth herein. The motion is denied only as

to DCI's request for leave to file a third amended

complaint. The Court defers ruling on DCI's motions in

limine and motion for sanctions.

(4)  The case will proceed to trial on Counts I, II, V, VI,

VII, and VIII.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this

30th day of December, 2025.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE